**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| ALIYA RAHMAN,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 26-cv-4764<br><br>**COMPLAINT** |

## INTRODUCTION

1. Aliya Rahman ("Ms. Rahman") is a Bangladeshi American who lives in South Minneapolis. She has spent most of her career as a software engineer, but in the fall of 2025 her focus was on recovering from a previous Traumatic Brain Injury ("TBI"). Then, on January 13, 2026, on Ms. Rahman's routine commute to her regularly scheduled TBI appointment, she became a target of "Operation Metro Surge."

2. During the Trump Administration's so-called "Operation Metro Surge," the United States government deployed over 3,000 federal agents to Minnesota. With U.S. Department of Homeland Security ("DHS") and White House encouragement, these agents invaded the streets of Minneapolis and St. Paul, where they routinely and without restraint engaged in excessive and inhumane force. They used chemical irritants, smashed people's car windows, and hit and violently threw individuals to the ground. Immigration enforcement officers used force indiscriminately and without cause when engaging with immigrants, protestors, observers, and even bystanders just going about their daily lives.

3. On January 13, 2026. Ms. Rahman never made it to her doctor's appointment. Ms. Rahman's route north on Park Avenue was blocked by immigration officers. Ms. Rahman

attempted to follow the officer's contradicting and chaotic instructions as she navigated the intersection. Masked officers responded with force. They smashed her front passenger window, dragged her out of her car, violently restrained her and then carried her like an animal by her arms and legs into an unmarked SUV. The officers arrested Ms. Rahman—a U.S. citizen who had not committed or threatened any crime or violence—without a warrant or probable cause.



4. Throughout the encounter, Ms. Rahman told officers she was autistic and had a TBI. She requested disability accommodations and medical care. Officers ignored her repeated requests and deteriorating health until after she became nonresponsive on the floor of her cell at the Bishop Henry Whipple Federal Building in Fort Snelling, Minnesota ("Whipple"). She woke up at the Hennepin County Medical Center ("HCMC") emergency room, shocked, but relieved to be alive.

5. The officers who targeted and abused Ms. Rahman violated her well-established constitutional rights. These include the Fourth Amendment's prohibition of unreasonable searches and seizures, the Fifth Amendment's due process right to adequate medical care and to be free from arbitrary detention, and the First Amendment's prohibition on retaliation. They also violated the Rehabilitation Act of 1973 prohibiting disability discrimination, Executive Order 13107 and corresponding international human rights law, as well as DHS's mandatory regulations, policies

and guidance barring arrests of individuals without probable cause and requiring officers to use only the minimal force necessary, to make accommodations when interacting with people with disabilities, and to provide timely medical attention to individuals in detention.

6. Ms. Rahman brings this lawsuit to redress the harm caused by the lawless actions of masked federal immigration officers and to hold the United States government accountable for its unprecedented campaign of violence in Minneapolis and across the country. She asserts claims under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1), 2671-2680, for assault, battery, false arrest and imprisonment, trespass to chattel, intentional infliction of emotional distress, negligence, willful and wanton negligence, and negligent supervision. Ms. Rahman seeks redress for the immense physical and emotional pain and suffering her own government has caused.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over Plaintiff's claims for money damages against the United States pursuant to 28 U.S.C. § 1346(b)(1) and 28 U.S.C. § 1331.

8. Plaintiff has exhausted all available administrative remedies under the FTCA. Plaintiff submitted all required administrative claims to DHS, U.S. Immigration and Customs Enforcement, ("ICE"), and U.S. Customs and Border Protection ("CBP") on April 16, 2026, more than six months ago. There has been no final disposition of her administrative claims, and Plaintiff now exercises the option to deem those claims denied pursuant to 28 U.S.C. § 2675(a).

9. Venue is proper under 28 U.S.C. §§ 1391 and 1402(b) because the events giving rise to this action occurred in this district.

## PARTIES

10. Plaintiff Aliya Rahman is a United States citizen and is a proud resident of Minneapolis, Minnesota, where she has lived since June 2025.

11. Defendant United States of America is a proper defendant under the FTCA. 28 U.S.C. §§ 1346(b), 2671, *et seq*. The United States is liable for the personal injuries of Ms. Rahman, caused by the wrongful acts or omissions of its employees, including employees of DHS and its constituent units, CBP and ICE, as well as the contractors that the agencies directly supervised. At all relevant times, the employees and contractors of those federal agencies referenced in this Complaint were acting within the scope of their employment under circumstances where the United States, if a private person, would be liable to Plaintiff in accordance with the law of the place where the act or omission occurred. *See* 28 U.S.C. § 1346(b).

## FACTUAL ALLEGATIONS

### I. The Trump Administration Facilitated Widespread Violence During Operation Metro Surge

12. Beginning in the summer of 2025, the Trump Administration surged its immigration enforcement operations in cities across the country, deploying thousands of masked agents to terrorize cities that included Los Angeles, Portland, and Chicago. Where previous administrations' immigration enforcement strategies focused on planned raids targeting pre-identified individuals, the Trump administration's enforcement plan relied on roving patrols of immigration officers, who often conducted unlawful and violent racially-motivated stops. This new strategy was deployed to meet the Administration's increasingly demanding immigration arrest quotas, which in May 2025 reached 3,000 people a day nationwide. To meet these demands, ICE rushed to double its

workforce and shortened its training program from 13 to 6 weeks.[1] White House officials exerted significant pressure on immigration enforcement officers to meet their quotas, and senior ICE official Marcos Charles instructed officers "to turn the creative knob up to 11" and to use tactics to "push the envelope" to increase immigration arrests.[2] As the agents moved from community to community, they unlawfully arrested and detained thousands of individuals, including over 500 U.S. Citizens, and unleashed unprecedented levels of violence.

13. Throughout the summer and fall of 2025, DHS, CBP and ICE leadership along with the White House, who were responsible for and ultimately oversaw the actions of immigration enforcement agents, failed to hold federal immigration officers accountable for their excessive uses of force against immigrants, protestors, bystanders, and press. Instead, knowing the harms that their officers were causing, the administration and DHS leadership emboldened them. They encouraged agents to act violently and to use less-lethal weapons on civilians. In June 2025, Greg Bovino, Former Commander-at-Large of CBP, told agents to "arrest as many people that touch [them] as [they] want to."[3] He stood by that statement when deposed about his agents' conduct in Chicago. On October 3, 2025, then-DHS Secretary Kristi Noem implored agents to "go hard" against protestors.[4] Later that month, then-White House Deputy Chief of Staff for Policy and

---

[1] Steve Inskeep, *Homeland security expert talks about ICE's truncated training after hiring blitz*, NPR (Jan. 9, 2026, at 4:40 AM ET), https://www.npr.org/2026/01/09/nx-s1-5671120/homeland-security-expert-talks-about-ices-truncated-training-after-hiring-blitz [https://perma.cc/57P4-K2WS].

[2] José Olivares, *US immigration officers ordered to arrest more people even without warrants*, Guardian (June 4, 2025), https://www.theguardian.com/us-news/2025/jun/04/immigration-officials-increased-detentions-collateral-arrests [https://perma.cc/B6XB-XPTG].

[3] Mina Bloom, *Border Patrol boss tells LA agents 'it's our f–king city' in new video*, L.A. Pub. Press (Nov. 10, 2025), https://lapublicpress.org/2025/11/border-patrol-la-our-city-video/ [https://perma.cc/V3VV-E7DE].

[4] Chip Mitchell, *Transcript: How Kristi Noem and Gregory Bovino Defend Effort to 'Hammer' Protesters*, WBEZ Chi. (Nov. 6, 2025), https://www.wbez.org/immigration/2025/11/06/homeland-security-border-patrol-blitz-kristi-noem-gregory-bovino-deportation-immigration-blitz-sara-ellis [https://perma.cc/HJ2W-JCVR].

Homeland Security Advisor Stephen Miller[5] spoke directly to agents on Fox News falsely stating, "to all ICE officers, you have federal immunity in the conduct of your duties."[6]

14. Across the country as the administration loudly promoted their abuses, courts repeatedly put DHS, ICE, and CBP on notice and ordered them to cease their unconstitutional conduct. A California federal court found that "the avalanche of evidence before the Court—along with federal officials' statements—suggests that federal agents acted pursuant to a common and widespread practice of violating the First Amendment rights of journalists, legal observers, and protestors" through federal agents' "retaliatory" and "indiscriminate" uses of force.[7] Another district court in Chicago described federal immigration agents' violence as an "unprecedented swath of indiscriminate uses of force" in granting a preliminary injunction against the government and its surge in Chicago.[8]

15. Failing to heed these judicial findings, in December 2025, the Trump administration turned its attention to Minnesota and launched "Operation Metro Surge." The White House crowed that the Trump Administration was "UNLEASHING a relentless assault" in Minnesota.[9]

16. The U.S. government sent over 3,000 federal agents to Minnesota in the largest deployment of immigration officers during the second Trump Administration. Prior to Operation Metro Surge, DHS had only assigned around 150 ICE officers to the Minneapolis and St. Paul area.

---

[5] On November 6, 2026 Stephen Miller was promoted to the White House Chief of Staff.

[6] Fox News, *Stephen Miller: East Wing was 'cheaply built,' long overdue for renovation*, at 6:37 (Fox News, Oct. 24, 2025), https://www.foxnews.com/video/6383815895112.

[7] *See Los Angeles Press Club v. Noem*, 799 F. Supp. 3d 1036, 1065, 1067 (C.D. Cal. 2025), *aff'd in part, vacated in part, remanded*, 171 F.4th 1179 (9th Cir. 2026).

[8] *Chicago Headline Club v. Noem*, 810 F. Supp. 3d 842 (N.D. Ill. 2025), *opinion vacated, appeal dismissed*, 168 F.4th 1033 (7th Cir. 2026); *see also* Julie Bosman, *Judge Criticizes Immigration Agents in Chicago: 'Use of Force Shocks the Conscience'*, N.Y. Times (Nov. 6, 2025), https://www.nytimes.com/2025/11/06/us/sara-ellis-gregory-bovino-tear-gas-illinois.html [https://perma.cc/G3CF-KC6M].

[9] The White House (@WhiteHouse), X (Jan. 5, 2026, at 15:54), https://x.com/WhiteHouse/status/2008296166773948523 [https://perma.cc/W3Q9-52YC].

17. In the weeks and months that followed the deployment, thousands of federal agents occupied Minneapolis and unleashed waves of violence against Minnesota residents. They carried out militarized raids, racially profiled community members, and conducted violent, unconstitutional arrests throughout the Twin Cities. They disappeared, assaulted, and killed community members. On January 7, they shot and killed Renee Good.

18. Less than 3 hours after Good's killing, DHS released an official statement calling her a violent rioter and domestic terrorist.[10] Later that night on X, allowing no time for an investigation, DHS posted a video of Secretary Noem falsely recounting the events that led to Good's death while stating "@POTUS Trump and @Sec_Noem will always have the backs of law enforcement."[11] President Trump similarly posted to Truth Social an inaccurate account of Good's killing and defended the shooting officer's actions.[12] In a press conference the next day, Vice President J.D. Vance once again justified the shooting, stating that the officer "is protected by absolute immunity," and that "[h]e was doing his job."[13] By January 9, DOJ leadership decided not to open a civil rights investigation into Good's killing, prompting at least six DOJ senior attorneys in the Civil Rights Division to quit in protest.[14]

---

[10] Danya Gainor & Annette Choi, *DHS was quick to defend fatal ICE shootings in January. Its statements appear to be changing*, CNN (July 15, 2026, at 4:50 PM ET), https://www.cnn.com/2026/07/15/us/dhs-statement-changes-ice-shootings-vis [https://perma.cc/3V2L-4ZWL].

[11] Dep't Homeland Sec. (@DHSgov), X (Jan. 7, 2026, at 6:23 PM), https://x.com/DHSgov/status/2009058387418562922?a=K25MjF_m-ZqHnn14H9Q&s=20 [https://perma.cc/VM82-XC6F].

[12] Donald J. Trump (@realDonaldTrump), Truth Social (Jan. 7, 2026, at 2:28 PM), https://truthsocial.com/@realDonaldTrump/posts/115855701696773990 [https://perma.cc/RBA7-NHAD]

[13] *Press Briefing: Karoline Leavitt Holds a Press Briefing at The White House - January 8, 2026*, Rollcall (Jan. 8, 2026), https://rollcall.com/factbase/trump/transcript/donald-trump-press-conference-briefing-karoline-leavitt-january-8-2026/ [https://perma.cc/PGV8-YSA4].

[14] Sarah N. Lynch, *Prosecutors in DOJ's Civil Rights Division will not investigate Minneapolis ICE shooting, sources say,* CBS News (Jan. 9, 2026, at 8:03 PM EST), https://www.cbsnews.com/news/doj-civil-rights-division-will-not-investigate-minneapolis-ice-shooting-sources-say/ [https://perma.cc/QN4V-9EBP]; Carol Leonnig & Ken Dilanian, *Top DOJ officials quit after their division refused to probe Minnesota ICE shooting*, MS Now (Jan. 12, 2026, at 11:05 PM EST), https://www.ms.now/news/doj-civil-rights-division-officials-quit-harmeet-dhillon [https://perma.cc/H3UD-4FL2].

19. Less than a week later, and just two blocks away, federal officers assaulted and unlawfully detained Ms. Rahman.

## II. Defendant's Officers Created Dangerous Conditions for Ms. Rahman, and then Smashed her Car Window Without Any Lawful Basis

20. On January 13, 2026, at around 9:45 am, Ms. Rahman was driving north on Park Avenue, a main thoroughfare in Minneapolis. She was taking her usual route from her home in South Minneapolis to a regular appointment at the Hennepin County Traumatic Brain Injury Center. Ordinarily, the drive takes between 10 to 15 minutes.

21. Since August 21, 2025, Ms. Rahman had invested deeply in her treatment and had attended at least 35 appointments at the TBI Center. She was anxious to reach her appointment.

22. As Ms. Rahman approached the intersection of Park Avenue and East 34th Street, traffic slowed down. She crept forward, eventually coming to a stop on Park Avenue. DHS vehicles blocked Park Avenue north of the intersection, causing traffic to back up far down the road.

23. On information and belief, DHS officers had been conducting an immigration enforcement action north of the intersection and had completed their immigration arrests by the time Ms. Rahman approached the intersection. Yet, officers did not leave the scene, and instead, continued blocking traffic with their vehicles.

24. In addition to the DHS vehicles and crowds of federal immigration officers, civilian bystanders and press gathered around the intersection to observe.

25. At the time Ms. Rahman arrived at the intersection, at least a dozen officers were walking around the area, many down the middle of the street, blocking traffic though no longer engaged in immigration enforcement. Officers had not established a clear system for directing traffic as additional officers continued to arrive at the scene despite having no immigration enforcement purpose to be there.

26. At one point, Ms. Rahman briefly stepped out of her vehicle—remaining at arm's length from the driver's side door, joining other nearby drivers who were doing the same—to see what was happening. Once the car in front of her started moving, Ms. Rahman returned to her vehicle and started moving slowly forward with the intention of continuing on to her doctor's appointment.

27. As Ms. Rahman inched her way into the intersection, a car was blocking her way to turn onto East 34th Street. At that moment, approximately six masked federal immigration officers, some who held cans of tear gas, surrounded her car.

28. Throughout the officers' interaction with Ms. Rahman, officers shouted conflicting orders at Ms. Rahman including to "go," "move," and "get the fuck out of the car." As some officers were ordering Ms. Rahman to turn off Park Avenue towards East 34th Street, two officers walked in front of her vehicle.

29. Officers were commanding her to go in a direction that was practically blocked. The nearby bike lane protruded out, narrowing the roadway and creating a difficult turn, especially as there was a car driving west toward Ms. Rahman on East 34th Street at the same time. Additionally, as Ms. Rahman attempted to turn right, an officer's car that had been parked in the bike lane began moving forward to the right of Ms. Rahman.

30. Officer J. Doe #1,[15] on Ms. Rahman's driver-side, yelled at Ms. Rahman through her window: "I will break your fucking window," or words to that effect. Ms. Rahman did not understand why she was being threatened since she had done nothing wrong. She was deeply scared and unsure of what to do.

[15] Photos of the J. Doe Officers are attached as Exhibit 1 to this Complaint.

31. She rolled down her driver's side window to avoid her window being broken, better communicate with the officers, and alert bystanders to the threats that were being lodged against her.

32. Officers continued yelling at her and banging on her car windows even as Ms. Rahman attempted to move through the intersection, as some officers had instructed. As Ms. Rahman slowly turned right onto East 34th Street, she became more scared and frustrated with how she was being treated and expressed her frustration to the officers. At one point, she told officers that they needed to learn how to respect human beings.

33. At no point in this interaction did Ms. Rahman engage in any violent or threatening conduct. At no point was any officer or bystander harmed or at risk of being harmed by Ms. Rahman. At no point did Ms. Rahman obstruct an ongoing immigration enforcement action.

34. Yet, suddenly, in apparent retaliation for Ms. Rahman's words, and contrary to the Constitution as well as mandatory regulations and DHS policies, J. Doe officer #2 punched her front passenger-side window. Glass shattered and flew across Ms. Rahman's face and body.




35. At the time J. Doe Officer #2 smashed Ms. Rahman's passenger car window, her driver-side window was still down and she had completely cleared the middle of the intersection,

leaving plenty of space for the apparent government vehicle that was behind her to drive around the rear of her car.

36. Though an officer had just smashed her window without any legal basis, covering her with broken glass, other officers immediately yelled at Ms. Rahman to "go," "get out," and "get out of here," gesturing eastward on East 34th Street.

37. Terrified and in shock, Ms. Rahman attempted to comply and drove forward, eastbound on East 34th Street. But at this point, officers stopped her, reaching through her windows at Ms. Rahman and pulling open her car doors.

38. As officers swung her car doors open, she yelled out, loudly enough to be captured on multiple bystanders' videos, that she is disabled.

39. An officer, believed to be J. Doe Officer #1 responded: "too fucking late." Another unknown officer told her "then listen to 'em, if you behave, you're fine."

## III. Defendant's Officers Violently and Unlawfully Arrested Ms. Rahman While Refusing to Accommodate her Disabilities

40. Ms. Rahman has several disabilities, including autism and disabilities related to a TBI. Due to Ms. Rahman's autism, she experiences auditory processing and sorting challenges, which can make communication difficult, especially in stressful situations.

41. Ms. Rahman suffered a TBI in August 2024, which, in combination with her existing diagnoses, has affected her cognitive and physical functioning and left her unable to work. She has had difficulty balancing while standing and walking and typically must walk with a cane.

42. The officers who attacked Ms. Rahman knew she had a disability. She told them so repeatedly, at least four times as officers entered her car. Officers knew they were required by federal law, regulations and DHS directives to take special precautions in their interactions with

her. Yet, they did not slow down the interaction, deescalate, or seek to accommodate her disabilities in any way, as required by law.

43. Instead, officers further escalated the interaction, grabbing at Ms. Rahman from both sides of the car. J. Doe Officer #3 violently pushed Ms. Rahman from the passenger side, while J. Doe Officers #1 and #4 pulled her out through the driver's side door and roughly dumped her onto the ground.

44. The officers caused Ms. Rahman to land hard on the ground, tangled in her seatbelt. Two officers, J. Doe Officers #1 and #5, then jerked her up from the ground. They pulled out knives, causing Ms. Rahman to fear they were going to use the weapons to harm her.




***J. Doe Officers #1 & #5 with their knives***

45. The officers cut through Ms. Rahman's seatbelt with their knives. Ms. Rahman yelled out once again that she was disabled and was trying to get to her doctor's appointment. Then she yelled again, "I am an autistic disabled person. I'm trying to go to a doctor."

46. Despite receiving more evidence of her disabilities, the officers did not change their violent tactics.

47. J. Doe Officers #1, 4, and 5 roughly pushed Ms. Rahman against her car, twisted her arms sharply, and tightly handcuffed her hands behind her back.

48. J. Doe Officer #1 then forcefully pulled Ms. Rahman away from her car by her arm, causing her to lose her balance and fall onto the cold pavement a second time. She could not break her fall, since officers had already handcuffed her. Her chest and her face hit the pavement hard. She tasted asphalt in her mouth. The fall caused Ms. Rahman extreme shooting pain in her neck, eyes, and head, and her vision began blurring.

49. Though she was already handcuffed and under the control of officers, J. Doe Officer #1 used an elbow to apply their bodyweight onto her neck and back. Ms. Rahman felt like she was being crushed. Her pain escalated as she yelled out "no, no, no." Knowing Renee Good had been shot and killed just days ago and merely blocks from the scene, Ms. Rahman feared for her life.




***J. Doe Officer #1 presses elbow into Ms. Rahman's neck and back***

50. Four officers then grabbed her and began lifting her by her arms and ankles, face down. The officers carried her in that position, still cuffed—like an animal—across the intersection and up the street towards their vehicles. J. Doe Officer # 1 carried Ms. Rahman's left arm. J. Doe Officer #4 carried Ms. Rahman's right arm. J. Doe Officer #6 carried Ms. Rahman's left leg. J. Doe Officer #7 carried her right leg.

51. The officers' inhumane and degrading method of carrying Ms. Rahman caused her arms to hyperextend and her shoulders to bear the brunt of her bodyweight. Ms. Rahman suffered severe pain in her shoulders, arms, and wrists.

52. The officers carried Ms. Rahman in this painful, inverted position for approximately 215 feet—more than the length of two basketball courts.



***Officers carry Ms. Rahman by her arms and legs***

53. All the while, Ms. Rahman continued to clearly state that she was disabled. She begged officers to put her down. The officers ignored her pleas. No other officers nearby intervened to help her.

54. Finally, the four officers shoved her into an unmarked car headfirst, as she continued to tell them that she was disabled, autistic, and has a brain injury. She explicitly told officers that it takes her time to understand instructions, and repeated multiple times, "I am disabled. I need accommodations."

55. After officers assaulted Ms. Rahman and carried her away from her car, an officer got into her car and attempted to move the vehicle. However, he was unsuccessful. On information and belief, upon failing to move Ms. Rahman's car, officers abandoned her vehicle on the street.

56. Throughout the encounter, officers used unreasonable and excessive force and failed to provide Ms. Rahman with any accommodations for her disabilities despite her repeated, clear requests for help. Their conduct was directly contrary to mandatory federal law as well as DHS regulations, policies, and directives that require officers to accommodate individuals with disabilities.

57. Officers never asked for Ms. Rahman's name, to see her identification, or whether she was a U.S. citizen. At no point did officers tell her that she was under arrest or clearly state their reasons for detaining her.

58. Ms. Rahman was not the target of any law enforcement investigation. Federal immigration officers are not empowered to enforce Minnesota traffic laws. Officers arrested Ms. Rahman without a warrant or probable cause that she had violated any law. Ms. Rahman did not engage in any unlawful conduct; she did not interfere with or impede officers.

## IV. Federal Officers Wrongfully Detained Ms. Rahman at Whipple and Continued to Deny Her Accommodations While Delaying Necessary Medical Care

59. Shortly after 10:00 am, three officers began transporting Ms. Rahman in their car to Whipple.[16]

60. During the drive to the detention facility, Ms. Rahman repeatedly requested disability accommodations. The officers responded by laughing at Ms. Rahman and accusing Ms. Rahman of lying.

61. Ms. Rahman asked officers for a lawyer, but the officers ignored her requests.

[16] Most individuals detained by DHS during Operation Midway Blitz were initially held at Whipple. In February of 2026 and again March of 2026, in a case concerning access to counsel, a federal court found that DHS had violated the Constitutional rights of thousands of people detained at Whipple. *See Advocs. for Hum. Rts. v. U.S. Dep't of Homeland Sec.*, 820 F. Supp. 3d 789 (D. Minn. 2026); *Advocs. for Hum. Rts. v. U.S. Dep't of Homeland Sec.*, 825 F.Supp.3d 858 (D. Minn. 2026).

62. The car arrived at an outdoor area at the backside of Whipple, and an officer Ms. Rahman had not seen before pulled Ms. Rahman, still handcuffed behind her back, out of the car by her shoulders, causing her more pain.

63. Ms. Rahman asked for a cane, which she typically uses to balance while standing and walking. The officer ignored her and, instead, locked his arm around her arm and jerked her around the outdoor area. This exacerbated Ms. Rahman's shoulder pain.

64. Due to Ms. Rahman's balance issues, she had difficulty walking and repeatedly stumbled while the officer continued dragging her through the area outside the facility in freezing temperatures.

65. In this outdoor area, Ms. Rahman saw many other detained individuals, mostly people of color, shackled to each other and being marched around by yelling officers. Officers referred to individuals, including Ms. Rahman, as "bodies." Ms. Rahman was shaken by the dehumanization she and others were experiencing. She feared what would happen to her, particularly as no one knew where she had been taken and since her ID, wallet, and phone had all been left in her car.

66. The officer then dragged Ms. Rahman to a folding table and pushed her down into a chair in the outdoor area. The two officers behind the table asked for Ms. Rahman's address and name, and if she had a social security number.

67. Sitting in the freezing cold and in pain, Ms. Rahman struggled to respond. Her speech began to slur as she attempted to provide the information they requested.

68. Ms. Rahman told the officers about her TBI and again requested disability accommodations. She specifically asked once again for a cane as well as a communication

navigator, explaining that as a result of her autism, she needs help communicating. She again requested a lawyer. The officers ignored all of her requests.

69. The officers then shackled her ankles. They took Ms. Rahman's belongings, including her jewelry and shoes, and gave her slippers that were too big for her feet.

70. While she was shackled, the officers yanked her out of the chair. One officer grabbed Ms. Rahman's arm and shoulder and began pulling her toward the building, while the other officer shoved her from behind, causing Ms. Rahman more pain. Ms. Rahman stumbled and repeated her requests for accommodations. In response, the officers mocked her, insisting that she could walk, and continued to shove her towards the building.

71. Once inside Whipple, the officers sat Ms. Rahman down on a metal bench and searched her without her consent.

72. By that point, Ms. Rahman was losing the ability to speak and walk. Through increasingly slurred speech, Ms. Rahman requested a wheelchair. She told a new set of officers that she was disabled. She told them she had a brain injury and that she was in extreme pain. She asked for medical care. Officers ignored each of her requests.

73. While on the bench, Ms. Rahman's head rolled to the side, and she struggled to sit up. Finally, after more requests, and as Ms. Rahman's condition continued to visibly worsen, someone brought Ms. Rahman a wheelchair.

74. An officer wheeled Ms. Rahman around Whipple, attempting to find an empty room in which to place her. Ms. Rahman asked the officer for emergency medical care, explaining through slurred speech that her head and neck hurt very badly. Instead of responding to her complaints or providing medical care, the officer mocked Ms. Rahman, saying, "you were driving right?" and "so your legs do work."

75. The officer eventually wheeled Ms. Rahman into a cell with a concrete bench and a camera and screen in one corner. Laughing, the officer told Ms. Rahman she could press the button on the wall if she needed anything. The button was behind her, and far out of her reach.

76. Ms. Rahman pleaded with the officer for a doctor. The officer ignored her and left her alone in the cell.

77. In the cell, Ms. Rahman felt her heartrate increase and she had severe head pain. She continued to experience blurred vision and slurred speech. She was increasingly terrified that she was experiencing a medical emergency, that no one knew where she was, and that she would die in the cell.

78. Sometime later, officers brought another woman into Ms. Rahman's cell. As soon as the woman saw Ms. Rahman's condition, she told officers that Ms. Rahman required medical care immediately. The officers also ignored Ms. Rahman's cellmate and left. Ms. Rahman's cellmate pushed the button on the wall to ask for a medic but no one responded.

79. More time passed and Ms. Rahman's pain increased. She could no longer sit up in her wheelchair so she laid down on the hard cell ground. She became disoriented, could no longer speak in full sentences, and her vision became blurred further.

80. Ms. Rahman's cellmate banged on the cell door. She yelled for the officers to get emergency medical care for Ms. Rahman. She told officers Ms. Rahman would die without medical care. Officers laughed at Ms. Rahman and her cellmate and walked away.

81. Ms. Rahman eventually lost consciousness in her cell. As she slipped out of consciousness she believed she would not make it out of Whipple alive.

82. Even after Ms. Rahman became nonresponsive, the officers continued to delay her medical care. They did not call 911 until approximately thirty minutes after Ms. Rahman's cellmate

begged officers to help Ms. Rahman and told officers that Ms. Rahman was on the floor and not responding or speaking.

83. When ICE officers finally called 911 about Ms. Rahman at approximately 12:00 pm, they reported that Ms. Rahman was suffering from chest pain and anxiety. This report was wholly inconsistent with Ms. Rahman's symptoms. On information and belief, during the 911 call, officers did not communicate to the emergency responders that Ms. Rahman was unresponsive, that she had previously suffered from a TBI, that she was suffering from extreme head pain, or that she was autistic or disabled.

84. When emergency responders from Allina Health arrived on scene around 12:13 pm, Ms. Rahman was nonresponsive. They did not begin transporting Ms. Rahman to the hospital until 12:39 pm.

85. When Ms. Rahman partially regained consciousness, she was in the ambulance. She heard someone instruct her to wake up, but she was unable to open her eyes, move, or speak. On information and belief, the speaker was an emergency responder from Allina Health.

86. The speaker threatened that if Ms. Rahman did not open her eyes, they would take her clothes off, put tubes in her, and that it would be very expensive. He repeated that they were going to take Ms. Rahman's clothes off.

87. The emergency responder stated that he knew Ms. Rahman was awake, and that if she did not wake up and talk, he would test her pain response. Ms. Rahman panicked. She wanted to talk, to blink, to move, to do anything to stop whatever the emergency responder was about to do. However, she was physically unable to do so.

88. The emergency responder then took Ms. Rahman's head in his hands and pressed a thumb into Ms. Rahman's throbbing head, pressing hard. Ms. Rahman could not speak or move or do anything to stop the extreme pain. Ms. Rahman once again lost consciousness.

89. Ms. Rahman arrived at HCMC Emergency Room around 1:05 pm. The emergency responders wheeled her in on a stretcher, still unconscious.

90. When she finally opened her eyes, she was in a bed in the emergency room and medical professionals had begun treating her for her injuries. Ms. Rahman asked a nurse where she was, and when he told her, relief washed over her as she realized she was going to survive the encounter.

91. At the hospital, Ms. Rahman presented with slurred speech, delayed response, and wrist and neck pain. The emergency medical team treated Ms. Rahman for injuries consistent with assault and a concussion. Ms. Rahman was released from HCMC later that afternoon.

92. When she left HCMC, medical staff told her that officers indicated that charges would be addressed at a later time. She left the hospital fearful of what was still to come.

93. Defendant's officers did not provide Ms. Rahman with any paperwork for her arrest that day and never cited or charged Ms. Rahman with any wrongdoing.

## V. Defendant Retaliated Against Ms. Rahman By Issuing Knowingly False Statements to the Press and Online, Compounding the Severe Emotional Distress from Her Assault, Arrest and Detention

94. Officers' brutal and unlawful arrest of Ms. Rahman was captured via photographs and videos by press and bystanders and went viral shortly after her arrest. Later that same evening, as footage of federal officers' violence against Ms. Rahman circulated widely on social media and in the press, DHS issued a post on its X account, with the word, "REMINDER" and falsely stating,

"To all ICE officers: You have federal immunity in the conduct of your duties," quoting and posting Stephen Miller's previous interview making this false claim.[17]

95. Defendant's abuse of Ms. Rahman did not end on January 13. In the months that followed, DHS and ICE repeatedly attacked Ms. Rahman online and spread false information about her and the January 13 incident.

96. The government issued social media posts garnering millions of views insinuating that Ms. Rahman had committed a crime, despite the government never charging her with any offense.

97. DHS issued official statements to the media falsely labeling Ms. Rahman as an "agitator" who impeded law enforcement operations. They falsely stated that any claims that Ms. Rahman was denied medical care were untrue, and that Ms. Rahman's speaking out about what happened to her was a "smear" leading to an increase in attacks on ICE agents.[18] DHS did not indicate it would investigate what happened to Ms. Rahman, but instead blamed Ms. Rahman's speech for causing them harm.

98. On February 3, 2026, Ms. Rahman testified at a Congressional hearing about the events of January 13. She described federal officers' violent and discriminatory conduct and their complete disregard for her safety and health. ICE responded to Ms. Rahman's testimony three days later by reposting a video of Ms. Rahman's Congressional testimony to X, stating that Ms. Rahman

[17] Dep't of Homeland Sec. (@DHSgov), X (Jan. 13, 2026, at 17:06), https://x.com/DHSgov/status/2011213308968538361?s=20 [https://perma.cc/345W-E4NK].

[18] Sophie Hurwitz, *ICE Smashed Her Car Window on the Way to the Doctor. Now She's Fighting Back.*, Mother Jones (Apr. 16, 2026), https://www.motherjones.com/politics/2026/04/ice-aliyah-rahman-tort-ntca-dhs/ [https://perma.cc/JJ6M-839A]; Associated Press, *Woman* dragged from car by ICE identified as U.S. citizen Aliya Rahman, CBC (Jan. 15, 2026, at 21:03 CST), https://www.cbc.ca/news/world/aliya-rahman-citizen-ice-arrest-9.7047853 [https://perma.cc/W5JN-VR9Z].

"continued to impede our officers, and found out the hard way." ICE also posted: "18 U.S.C. § 111 criminalizes impeding or interfering with federal officers."[19]

99. As a result of the months of government-issued false statements, Ms. Rahman was harassed online and received violent threats.

## VI. Defendant's Officers' Violent Conduct Continues to Cause Harm to Ms. Rahman

100. As a result of the federal officers' heinous, unlawful, and discriminatory conduct, Ms. Rahman suffered severe emotional distress and physical pain and suffering. The brutal encounter with federal officers in January continues to significantly and negatively impact Ms. Rahman's health.

101. The officers' abuse on January 13 caused her to suffer painful injuries to her head, neck, and shoulders. She also struggled with her speech and vision, especially in the immediate aftermath of her arrest and detention. While at Whipple, Ms. Rahman lost consciousness, and experienced slurred speech and blurred vision. She continues to suffer from double vision and reduced peripheral vision.

102. As a result of the officers' and the government's heinous conduct on January 13 and in the months that followed, Ms. Rahman has also experienced psychological, emotional, and other mental harm. Officers' violent treatment of Ms. Rahman caused her to fear for her life. During her encounter with the federal immigration officers, she knew that Renee Good had been killed just two blocks away, six days prior. As an autistic, Bangladeshi-American woman, she had been horrified by past incidents of law enforcement killing Black and Brown individuals with disabilities. Ms. Rahman was afraid she would not survive her encounter with Defendant's federal

[19] U.S. Immigr. and Customs Enf't (@ICEgov), X (Feb. 6, 2026, at 16:03), https://x.com/ICEgov/status/2019804241343234265?s=20 [https://perma.cc/L6PL-AXDH].

agents when she was pinned under their bodies on the street or later losing consciousness at Whipple. Her fear only escalated when her pleas for medical care went unanswered.

103. Ms. Rahman continues to suffer from severe stress and anxiety, which interfere with her daily life and cause her significant distress. She was previously diagnosed with PTSD, and the January 13 incident has severely exacerbated her symptoms. Immediately after the incident, she did not feel safe living at home because she did not know if and when immigration officers would turn up. She continues to experience marked limitations in her ability to interact socially, intrusive memories of the incident, dissociative reactions, increased physical pain in her neck, shoulders, and head due to distress, extreme and near-daily sleep disruptions and insomnia, and severe hypervigilance regarding potential threats.

104. Ms. Rahman remains deeply distressed and traumatized that her own government, after assaulting and falsely arresting her, continues to make statements through its official social media channels and to the press that identify her, use threatening language about her, and spread lies.

105. Prior to January 13, Ms. Rahman had been engaged in intensive treatment at the TBI clinic and was making progress in her recovery. Since January, the physical injuries and emotional and psychological distress that officers inflicted have interfered with her ability to continue her intensive treatment plan, which was her primary focus prior to the assault, despite that many of her symptoms were exacerbated.

106. Ms. Rahman continues to undergo medical and mental health treatment for the various physical and emotional harms she sustained.

107. In all, the trauma caused by the government's actions and omissions continues to diminish her quality and enjoyment of life.

## VII. Defendant's Misconduct was Unlawful and Officers Violated Their Non-Discretionary Obligations

108. The Homeland Security Act of 2002 created the United States Department of Homeland Security. The stated mission of DHS includes ensuring "that the civil rights and civil liberties of persons are not diminished by efforts, activities, and programs aimed at securing the homeland."[20]

109. The officers who violently arrested and detained Ms. Rahman did so without any legitimate basis. In subjecting her to dehumanizing and discriminatory treatment, they violated multiple non-discretionary duties.

### *A. Excessive Force and Unlawful Arrest*

110. Federal officers subjected Ms. Rahman to excessive force and unreasonable seizure in violation of the Constitution as well as applicable regulations, rules, and standards governing DHS officers' conduct during arrests.

111. Officers' use of force and arrest of Ms. Rahman—with no lawful basis—violated Ms. Rahman's Fourth Amendment right to be free from excessive force and unreasonable seizure. *See* U.S. Const. amend. IV; *Graham v. Connor*, 490 U.S. 386 (1989); *Lambert v. City of Dumas*, 187 F.3d 931, 935 (8th Cir. 1999). Under the totality of circumstances, officers' use of force against Ms. Rahman at and near East 34th Street and Park Avenue was objectively unreasonable, and they had no lawful basis or probable cause to detain or arrest her.

112. Officers' retaliatory use of force, in apparent response to Ms. Rahman's speech, also violated Ms. Rahman's First Amendment Rights. *See Wolk v. City of Brooklyn Ctr.*, 107 F.4th 854, 859-60 (8th Cir. 2024); *Naucke v. City of Park Hills*, 284 F.3d 923, 927-28 (8th Cir. 2002).

---

[20] 6 U.S.C. § 111(b)(1)(G).

Defendant continued to violate Ms. Rahman's First Amendment rights when it made false social media posts about her in retaliation for her Congressional testimony.

113. Officers violated non-discretionary regulations and policies. 8 C.F.R § 287.8(a)(i)-(iii) imposes a mandatory, non-discretionary duty on DHS—and component agencies—to use force only when an officer has "reasonable grounds to believe that such force is necessary," and to "always use the minimum non-deadly force necessary."

114. The DHS Use of Force Policy permits law enforcement officers to use force "only when no reasonably effective, safe, and feasible alternative appears to exist."[21] Officers violated their own regulations and policies by using any amount of force against Ms. Rahman, who posed no threat and was not resisting officers.

115. The DHS Use of Force Policy also places on officers a mandatory "duty to intervene to prevent or stop a perceived use of excessive force by another LEO."[22] Yet, no officers intervened to prevent or stop the abuse against Ms. Rahman.

116. Officers' conduct in arresting Ms. Rahman also violated 8 U.S.C. §§ 1357(a)(2), (a)(5) and 8 C.F.R § 287.8(c), which permit federal immigration officers to execute an arrest *only when* the officer "has reason to believe the person to be arrested has committed an offense against the United States or is a [non-citizen] illegally in the United States."[23] Officers had no reason to believe Ms. Rahman had committed any offense or that she was a non-citizen illegally in the United States.

---

[21] U.S. Dep't of Homeland Sec., Policy Statement 044-05 (Revision 01), *Update to the Department Policy on the Use of Force* ("DHS Use of Force Policy") (Feb. 6, 2023).
[22] *Id.* § III.H.
[23] 8 C.F.R § 287.8(c).

117. DHS regulations also impose a mandatory, non-discretionary duty on officers to identify themselves and state that the individual is under arrest and the reason for arrest.[24] For criminal violations, the arresting officer is required to "advise the person of the appropriate rights as required by law at the time of the arrest, or as soon thereafter as practicable," and the advisal of rights "shall be documented" in DHS forms and as part of the arrest record."[25]

118. At no time did officers identify themselves to Ms. Rahman, nor did they ever tell her she was under arrest or the reason for her arrest. They also failed to advise Ms. Rahman of her rights, and they refused her request to speak to a lawyer. On information and belief, officers never documented the (lack of) advisal of rights.

119. Defendant also violated Executive Order 13107 which obligates DHS and its component agencies ICE and CBP to comply with the international human rights treaties to which the United States is a party, including the International Covenant on Civil and Political Rights ("ICCPR"), and the Convention against Torture ("CAT"). In violation of their mandatory obligations under ICCPR and CAT, officers used excessive force against Ms. Rahman and arbitrarily arrested and detained her.

### *B. Punitive Detention and Inadequate Medical Care*

120. Officers subjected Ms. Rahman to punitive conditions with no legitimate purpose and denied her proper medical treatment, in violation of numerous mandatory, nondiscretionary obligations the agents were required to follow.

121. In doing so, officers violated Ms. Rahman's Fifth Amendment Due Process rights, which protects individuals in pretrial and civil immigration detention from "arbitrary and purposeless conditions of confinement," *Bell v. Wolfish*, 441 U.S. 520, 539 (1979), and guarantees

---

[24] *See* 8 C.F.R. § 287.8(c).
[25] *See* 8 C.F.R. § 287.8(c)(2)(v).

the right to adequate medical care, *see, e.g., Doe v. Kelly*, 878 F.3d 710, 722 (9th Cir. 2017); *D.N.N. v. Liggins*, 822 F.Supp.3d 543, 591-93 (D. Md. 2026).

122. They also violated the mandatory, nondiscretionary duties set out in applicable policies and standards, including in ICE ERO Directive 11087.2: Operations of ERO Holding Facilities ("Directive 11087.2"), which requires officers to "[m]onitor detainees for any apparent indications of mental or physical health conditions . . . that may require closer supervision or emergency medical care."[26] It also requires officers to "[r]espond immediately to observed or reported medical emergencies and contact local emergency medical services when a detainee is determined to need urgent medical care."[27]

123. Officers' conduct contravened ICE Directive 19009.3: Firearms and Use of Force (May 26, 2023) and the DHS Use of Force Policy which requires that, following any use of force incident, officers seek medical assistance for individuals who appear to be injured, request medical assistance, or have complaints of injuries.[28] Officers failed to monitor Ms. Rahman for obvious indications of deteriorating health conditions requiring medical care, repeatedly ignored Ms. Rahman and her cellmate's pleas for Ms. Rahman to be provided medical care, and delayed contacting emergency medical services for Ms. Rahman until and even after she was unresponsive.

124. Officers' conduct also violated Executive Order 13107 by failing to comply with CAT and ICCPR, which requires officers to provide detained individuals with necessary medical care, and to treat detained individuals with humanity and respect for their dignity and lives.

---

[26] U.S. Immigr. and Customs Enf't Off. of Enf't and Removal Operations, ICE ERO Directive 11087.2, *Operations of ERO Holding Facilities* ("Directive 11087.2") (Jan. 31, 2024). § 5.1(2).
[27] *Id.* § 5.9(b).
[28] U.S. Immigr. and Customs Enf't Off. of Enf't and Removal Operations, ICE ERO Directive 19009.3, *Firearms and Use of Force* (May 26, 2023); DHS Use of Force Policy § III.G.

### *C. Disability Discrimination and Failure to Provide Accommodations*

125. The Rehabilitation Act of 1973 ("Rehab Act") imposes a mandatory, non-discretionary duty that requires DHS officers to make reasonable accommodations for a person's disabilities and prohibits discriminating against individuals based on their disabilities. *See Thiersaint v. Dep't of Homeland Sec.*, 85 F.4th 653, 659 (1st Cir. 2023).

126. DHS's regulations implementing the Rehab Act, located at 6 C.F.R. §§ 15 *et seq*., apply to all components of the department. They impose a nondiscretionary obligation on DHS officers to provide reasonable accommodations to persons with disabilities and prohibit discrimination on the basis of disability. DHS and its agencies have also promulgated directives, guides, and training materials that operationalize these mandatory regulations for their officers.

127. Throughout Ms. Rahman's encounter with officers, she repeatedly communicated the fact that she is a disabled person and requested accommodations countless times. Yet, in violation of non-discretionary federal law and regulations, officers repeatedly refused to accommodate her physical disabilities, failed to provide a communication navigator or other communication accommodations, and failed to provide information about her disabilities to emergency medical personnel.

## <u>CAUSES OF ACTION</u>

### COUNT I
### Federal Tort Claims Act, 28 U.S.C. § 1346(b)
### Assault

128. All of the foregoing allegations are repeated and realleged as though fully set forth herein.

129. Under Minnesota law, an assault is committed when 1) a defendant acts with intent to cause apprehension or fear of imminent harm or offensive contact; 2) the defendant had the

apparent ability to cause the harm or offensive contact; and 3) the plaintiff had a reasonable apprehension or fear that the imminent harm or offensive contact would occur.

130. DHS officers, without any legal authority, acted intentionally to cause Ms. Rahman apprehension or fear of imminent harm or offensive contact to Ms. Rahman when they threatened to smash her window, and proceeded to violently pull Ms. Rahman from her car, shove her on the ground, and unlawfully arrest her.

131. At the time of these actions, DHS officers had the apparent ability to cause the harmful or offensive contact to Ms. Rahman, as evinced by the fact that they did in fact cause the harmful and offensive contact to Ms. Rahman.

132. Ms. Rahman had engaged in no unlawful conduct and posed no threat to officers. She had a reasonable apprehension or fear of imminent harmful or offensive contact.

133. Through their unlawful and intentional conduct, the federal officers directly and proximately caused Ms. Rahman to suffer mental and physical injuries.

134. Because the officers were employees of the United States acting within the scope of their offices and employment, Defendant, the United States is liable to Ms. Rahman under the FTCA. 28 U.S.C. §§ 1346(b)(1), 2674.

**COUNT II**
**Federal Tort Claims Act, 28 U.S.C. § 1346(b)**
**Battery**

135. All of the foregoing allegations are repeated and realleged as though fully set forth herein.

136. Under Minnesota law, battery is committed when a defendant intentionally causes harmful or offensive contact with the plaintiff.

137. Federal officers intentionally caused harmful or offensive contact with Ms. Rahman when, without any lawful basis, they smashed Ms. Rahman's car window glass, which struck Ms.

Rahman, pulled her out of her car, caused her to fall onto the ground, applied their bodyweight into her back and neck, handcuffed her, and carried her for approximately 215 feet like an animal. At Whipple, federal officers continued causing harmful or offensive contact when they pushed and pulled Ms. Rahman around the facility by her arms and shoulders.

138. Through their intentional conduct, federal officers proximately and directly caused Ms. Rahman substantial physical and mental harm.

139. Because the officers were employees of the United States acting within the scope of their offices and employment, Defendant, the United States is liable to Ms. Rahman under the FTCA. 28 U.S.C. §§ 1346(b)(1), 2674.

**COUNT III**
**Federal Tort Claims Act, 28 U.S.C. § 1346(b)**
**False Arrest & False Imprisonment**

140. All of the foregoing allegations are repeated and realleged as though fully set forth herein.

141. Under Minnesota law, false arrest or imprisonment requires 1) words or acts intended to confine or restrict the physical liberty of an individual; 2) actual confinement of the individual; and 3) awareness by the plaintiff that she is confined.

142. Federal officers intentionally restricted Ms. Rahman's physical liberty by their words and actions, including by physically and violently detaining and handcuffing her, carrying her like an animal to their vehicle, transporting her to Whipple, and detaining her at Whipple against her will. They also repeatedly denied her access to a lawyer, both at the scene of the arrest and at Whipple.

143. Ms. Rahman was aware of the federal officers' conduct and was harmed by it. At all relevant times, Ms. Rahman believed that the federal officers had the ability to carry out their threats of physical force and she was aware that she was confined by federal officers.

144. The federal officers who arrested and detained Ms. Rahman had no legal authority to detain or arrest her. Federal immigration enforcement officers have no authority to enforce Minnesota traffic laws. The officers had no probable cause to believe that Ms. Rahman had violated any federal law. Ms. Rahman was complying with officers' instructions when officers arrested her. The officers appear to have targeted Ms. Rahman for arrest in retaliation to her expressing frustration with and alerting others to the officers' threats and hostility.

145. Federal officers' conduct directly and proximately caused Ms. Rahman to suffer mental and physical harm.

146. Because the officers were employees of the United States acting within the scope of their offices and employment, Defendant, the United States is liable to Ms. Rahman under the FTCA. 28 U.S.C. §§ 1346(b)(1), 2674.

**COUNT IV**
**Federal Tort Claims Act, 28 U.S.C. § 1346(b)**
**Trespass to Chattel**

147. All of the foregoing allegations are repeated and realleged as though fully set forth herein.

148. Under Minnesota law, a trespass to chattel occurs by intentionally 1) dispossessing an individual of the chattel; or 2) using or intermeddling with a chattel in the possession of another person.

149. J. Doe Officer #2 intentionally interfered with Ms. Rahman's personal property when he, without any lawful basis, smashed the passenger window of her car with his fist.

150. At no time did any agent of the federal government repair or cover the costs to repair Ms. Rahman's vehicle.

151. Because the officers were employees of the United States acting within the scope of their offices and employment, Defendant, the United States is liable to Ms. Rahman under the FTCA. 28 U.S.C. §§ 1346(b)(1), 2674.

**COUNT V**
**Federal Tort Claims Act, 28 U.S.C. § 1346(b)**
**Intentional Infliction of Emotional Distress**

152. All of the foregoing allegations are repeated and realleged as though fully set forth herein.

153. Under Minnesota law, intentional infliction of emotional distress occurs when 1) the defendant's conduct was extreme and outrageous; 2) the conduct was intentional or reckless; 3) the conduct caused emotional distress; and 4) the emotional distress was severe.

154. As described in this Complaint, federal officers committed extreme and outrageous conduct with an intent to cause, or in reckless disregard of the probability of causing, Ms. Rahman to suffer severe emotional distress. They violently arrested Ms. Rahman, a U.S. citizen who was not engaging in any unlawful or threatening conduct, and who was attempting to follow their instructions. They carried her, faced down and handcuffed, for over 200 feet by her arms and legs. They repeatedly refused to provide her with accommodations despite clear knowledge of her disabilities, and instead, mocked her for her disabilities. They delayed providing her with emergency medical care, even when she begged and then became nonresponsive in her cell. The government made false statements to national press outlets and on official social media platforms with millions of followers, causing her to suffer severe emotional distress.

155. The government's extreme and outrageous conduct violated the boundaries of decency and is utterly intolerable in a civilized community.

156. Due to federal officers' conduct, Ms. Rahman suffered, and continues to suffer, severe emotional distress with physical manifestations.

157. Because the officers were employees of the United States acting within the scope of their offices and employment, Defendant, the United States is liable to Ms. Rahman under the FTCA. 28 U.S.C. §§ 1346(b)(1), 2674.

**COUNT VI**
**Federal Tort Claims Act, 28 U.S.C. § 1346(b)**
**Negligence**

158. All of the foregoing allegations are repeated and realleged as though fully set forth herein.

159. Federal officers owed Ms. Rahman a duty of reasonable care in the conduct of law enforcement operations, including a duty to protect her from dangerous conditions at and near the intersection of East 34th Street and Park Avenue. Federal officers also owed Ms. Rahman a duty of care to protect her from reasonably foreseeable harm as a result of arresting and detaining her.

160. The mandatory standards governing federal immigration enforcement and treatment of detained individuals, including 8 C.F.R. § 287.8, DHS use-of-force policies, ICE Directives and training, the Rehab Act and implementing regulations, as described above, reflect and inform the standard of care.

161. Federal officers breached their duty to Ms. Rahman at the site of her arrest by creating a dangerous situation on East 34th Street and Park Avenue and blocking Park Avenue without traffic control. In this dangerous situation, officers gave Ms. Rahman contradictory instructions, further heightening the risk of danger to Ms. Rahman.

162. Federal officers also breached their duty to Ms. Rahman by failing to accommodate her disabilities throughout her arrest, transport, and detention; delaying the provision of medical care; failing to provide accurate information to emergency responders; and targeting her in a press and social media disinformation campaign after her unlawful detention.

163. Federal officers' breach of their duty of care to Ms. Rahman proximately caused Ms. Rahman to suffer mental and physical harm.

164. Because the officers were employees of the United States acting within the scope of their offices and employment, Defendant, the United States is liable to Ms. Rahman under the FTCA. 28 U.S.C. §§ 1346(b)(1), 2674.

**COUNT VII**
**Federal Tort Claims Act, 28 U.S.C. § 1346(b)**
**Willful and Wanton Negligence**

165. All of the foregoing allegations are repeated and realleged as though fully set forth herein.

166. Under Minnesota law, the elements of willful and wanton negligence are: 1) the plaintiff was in peril; 2) the defendant knew plaintiff was in peril; 3) defendant failed to exercise ordinary care to avoid injury to plaintiff; and 4) defendant's failure to exercise ordinary care caused injury to plaintiff.

167. Ms. Rahman was in peril. Officers saw and knew that Ms. Rahman was medically deteriorating and exhibiting serious medical symptoms—at one point, even becoming non-responsive. It was obvious from the circumstances that Ms. Rahman required immediate medical attention.

168. Ms. Rahman repeatedly requested such care, informed them she was in pain, and told officers she had previously suffered TBIs. Ms. Rahman's cellmate also begged officers to provide Ms. Rahman with medical care. Officers saw when Ms. Rahman was nonresponsive.

169. Officers failed to exercise ordinary care, as described above, by significantly delaying providing Ms. Rahman with medical care.

170. Officers' failure to exercise ordinary care caused Ms. Rahman physical and emotional harm.

171. Because the officers were employees of the United States acting within the scope of their offices and employment, Defendant, the United States is liable to Ms. Rahman under the FTCA. 28 U.S.C. §§ 1346(b)(1), 2674.

**COUNT VIII**
**Federal Tort Claims Act, 28 U.S.C. § 1346(b)**
**Negligent Supervision**

172. All of the foregoing allegations are repeated and realleged as though fully set forth herein.

173. Under Minnesota law, an employer is liable for negligent supervision when 1) the employee's tortious conduct was foreseeable; and 2) the employer failed to exercise ordinary care when supervising the employee.

174. It was foreseeable to DHS, ICE, CBP and the Trump Administration that the J. Doe Officers would commit assault, false arrest & imprisonment, trespass to chattel, and intentional infliction of emotional distress, and engage in negligent conduct while engaging in enforcement activities.

175. Defendant was on notice that their officers had engaged in such tortious conduct across the country prior to Metro Surge, and in the days and weeks leading up to January 13. Just a week prior to the officers' abuse of Ms. Rahman, DHS officers had shot and killed a civilian, Renee Good.

176. DHS, ICE, CBP, and the Trump Administration—the architects of Operation Metro Surge—failed to exercise ordinary care in their supervision of the officers they deployed to Minnesota by failing to investigate their officers' unlawful misconduct, promoting and condoning their officers' violent tactics, and inciting their officers to violate individuals' rights. As a result, Defendant failed to prevent the wholly foreseeable misconduct of its officers, including J. Doe Officers, from causing harm to individuals, including Ms. Rahman.

177. DHS, ICE, CBP, and the Trump Administration's negligent supervision directly and proximately caused Ms. Rahman to suffer mental and physical harm.

178. Because the officers were employees of the United States acting within the scope of their offices and employment, Defendant, the United States is liable to Ms. Rahman under the FTCA. 28 U.S.C. §§ 1346(b)(1), 2674.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests as follows:

1. Compensatory damages against Defendant for the physical and emotional injuries she has suffered and continues to suffer;
2. Plaintiffs' costs and disbursements as allowed by law; and
3. Such other and further relief as the Court may deem just and proper.

Dated: November 10, 2026

Respectfully submitted,

**COUNSEL FOR PLAINTIFF**

*/s/ Alphonse A. Gerhardstein*

Alphonse A. Gerhardstein
MN #0343316
Friedman, Gilbert + Gerhardstein
35 E 7th Street, Suite 201
Cincinnati, Ohio 45202
Tel: (513) 572-4200
al@fggfirm.com

Jessica Gingold*
Chisato Kimura*
Alexa Van Brunt*
**MacArthur Justice Center**
25 E. Washington St., Suite 1515

Chicago, IL 60602
Tel: (312) 373-1727
jessica.gingold@macarthurjustice.org
chisato.kimura@macarthurjustice.org
alexa.vanbrunt@macarthurjustice.org

*Motion for Pro Hac Vice admission to the U.S. District Court for the District of Minnesota forthcoming.